Joan L. HILL, Plaintiff,

v.

William R. BERKMAN, Chief of the Army Reserve, John O. Marsh, Secretary of the Army, Casper W. Weinberger, Secretary of Defense, Unnamed Federal Officials, individually or in their official capacities, Defendants.

No. 85–CV–389 (JBW).

United States District Court, E.D. New York.

May 15, 1986.

---

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Audrey S. Feinberg, Bronx, N.Y. Bronx Legal Services, by Lucy Billings, for plaintiff.

Raymond J. Dearie, U.S. Atty., Brooklyn, N.Y. by Thomas B. Roberts, Office of the Judge Advocate Gen. by Lieutenant Colonel Marshal M. Kaplan, Major Anthony V. James, for defendants.

Stroock & Stroock & Lavan, New York City by David Stein, for Women's Equity Action League amicus curiae.

### MEMORANDUM and ORDER

WEINSTEIN, Chief Judge:

Plaintiff Joan Hill sues the Secretary of Defense, the Secretary of the Army, the Chief of the Army Reserve and other officials, alleging violation of her right to be free from discrimination on the basis of sex. She enlisted in the United States Army on the understanding that she would

become a chemical specialist. After her enlistment, the position that she sought was closed to women on the justification that persons with this specialty would likely be exposed to combat.

The court orally dismissed the claims against defendants in their individual capacities and denied them Rule 11 sanctions. In their official capacities, defendants now move to dismiss the complaint for failure to state a claim and, alternatively, for summary judgment. The government's motion for summary judgment must be granted.

While the matter is not free of doubt, on balance the arguments in favor of granting women in the armed services the protection of Title VII of the Civil Rights Act are persuasive. In this case plaintiff's rights under that Act were not violated.

## I. FACTS

Plaintiff's and defendants' version of the facts do not substantially differ.

In May of 1982, while employed as a clerk in a New York financial firm, Joan Hill enlisted in the Army Reserve in Brooklyn. She was accepted for the position of Nuclear Biological and Chemical Specialist ("NBC Specialist") with a rank of private. An NBC Specialist examines contaminated areas after nuclear, biological or chemical attack. She agreed to attend weekend drills in New York prior to basic training; receive two months of basic training at Fort Jackson, South Carolina, followed by two months of specialized training at Fort McClellan, Alabama; and work approximately one weekend per month and attend two weeks of summer training for the next six years. Compensation was to include training in job skills; salary and bonuses with room, board, uniforms and other benefits during training; salary and medical, dental and life insurance, travel discount, commissary, pension and other benefits after training; and the opportunity to be promoted in rank and salary.

Hill qualified for the position of NBC Specialist on the basis of a written examination and her educational background. She was deemed medically qualified. The Army Reserve set the date for her to proceed to Jackson for basic training on November 12, 1982.

Between May and November 1982, Hill attended the requisite weekend drills as part of the 407th Unit of the Army Reserve at the Reserve Center in Jamaica, Queens, for which work she received a salary. During the drills, the men in the unit often told Hill that as a woman she should not be an NBC Specialist but should change to a clerical job. In one instance a similar statement was made by a superior officer. Nevertheless, Hill prepared for her further training. She purchased the requisite special clothing and equipment at her own expense. She gave up her Manhattan apartment, stored her furniture, and took an unpaid leave of absence from her permanent full-time employment. During this period, Hill received assurances that she would be transferred for full-time training on November 12, 1982.

Meanwhile, in September 1982, defendants had closed the NBC Specialist and 22 other positions to women. The Army did not notify Hill of the closure. When Hill reported on November 12, 1982 for transfer to Fort Jackson, she was informed that she would have to gain weight. She returned with the required weight about November 22, 1982. Army personnel refused to see her. About December 3, 1982, Hill was notified that she was now medically qualified but there was no reservation for her to ship out for basic training.

Finally, about December 8, 1982, Hill was apprised by the Army that it had reclassified the NBC Specialist position as a "combat support role" and closed it to women. She also was told that she was honorably discharged from the Army Reserve and that she would receive her discharge papers promptly. In fact she did not receive the honorable discharge papers until more than a year later, on March 29, 1984. Without them, she had difficulty securing employment. Hill had no income from November 12, 1982 until February 1,

1983, when she regained her job with her former employer.

The Army had closed the NBC Specialist position to women on the recommendation of the Women in the Army Policy Review Group, an organization created within the Pentagon in 1981 to study various issues concerning women in the Army. During that year General Charles Hines devised a new method of calculating which soldiers were most likely to engage in direct combat. General Hines, who has a Ph.D. in social psychology, relied on organizational descriptions and questionnaires to identify the probability of combat in every Army position. As more particularly described in Part III, *infra,* he reported that the NBC Specialist position was one from which combat replacements were drawn, and that if more than a few women occupied the position combat readiness would be endangered. Accordingly, the policy group recommended that the position be closed to women. The Army followed this recommendation.

The decision generated adverse comment. In April 1983 the Army reassessed the NBC Specialist position and others in light of newly created personnel categories. General Hines' methodology was again followed. The 1983 results showed that positions at the combat-likelihood level of NBC Specialist could accommodate more women without a threat to combat readiness. Accordingly, in October 1983, the Army reclassified the NBC Specialist position as non-combat. Women are now working in the position Hill chose, qualified for, and could not enter.

Since the claims against the individual defendants and the request for damages pursuant to the Fifth Amendment have been dismissed, all that remains of plaintiff's action in this court are two claims: one based upon Title VII and one for a declaration that plaintiff's equal protection rights under the Constitution were violated.

## II.  TITLE VII

Whether Title VII applies to the uniformed members of the armed forces is not clear. The bare language used by Congress supports plaintiff's position. Some of the history, antecedents and analogous statutory treatment argue in favor of defendants' view. The legislative history is sparse to nonexistent. If Congress gave any thought to the issue this court has found no appreciable written traces of its cogitation.

An analysis of the problem presents two issues. First, does Title VII apply, and, if it does, second, was the discrimination authorized because of a bona fide occupational qualification.

### A.  *Applicability of Title VII to the Armed Forces*

Title VII was enacted in 1964, as a part of omnibus legislation, to make it illegal for an employer to discriminate in employment on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–2. It empowered both private and governmental enforcement. *See* 42 U.S.C. §§ 2000e–5, 2000e–6, 2000e–8, 2000–12. The Civil Rights Act of 1964 covered all private employers, except those that did not affect interstate commerce, and those with fewer than fifteen employees. *See* 42 U.S.C. §§ 2000e–7, 2000e(b).

In 1972, Congress amended Title VII to cover employees of the federal government:

> *Discrimination prohibited. All personnel actions affecting employees or applicants for employment* (except with regard to aliens employed outside the limits of the United States) *in military departments as defined in section 102 of title 5,* in executive agencies as defined in section 105 of title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Rate Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the legislative and judicial branches of the Federal Government hav-

ing positions in the competitive service, and in the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin.

Act of March 24, 1972, Pub.L. No. 92–261, 86 Stat. 111, *codified at* 42 U.S.C. § 2000e–16(a) (1972) (emphasis added).

Section 102 of Title 5 states in full:

The military departments are:

The Department of the Army.

The Department of the Navy.

The Department of the Air Force.

42 U.S.C. § 2000e–16(a) provides no other definitions or explanations of these terms.

On their face these provisions include the armed forces. Plaintiff, in addition, argues that Title VII, as a broad remedial statute, should be applied to discrimination on the basis of sex within the uniformed military. Defendants take the position that history and a common sense evaluation of the special needs of the military make it absurd to read Title VII literally.

We are somewhat trepidacious about holding that Title VII applies to the military forces because case law has consistently held to the contrary. *See Gonzalez v. Department of the Army,* 718 F.2d 926, 927–29 (9th Cir.1983); *Taylor v. Jones,* 653 F.2d 1193, 1200 (8th Cir.1981); *Johnson v. Hoffman,* 424 F.Supp. 490, 493 (E.D.1977), *aff'd sub nom. Johnson v. Alexander,* 572 F.2d 1219, 1223–24 (8th Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978); *Cobb v. United States Merchant Marine Academy,* 592 F.Supp. 640, 642 (E.D.N.Y.1984); *Hunter v. Stetson,* 444 F.Supp. 238, 239 (E.D.N.Y.1977) (dicta). With the aid of the excellent briefs of plaintiff's distinguished pro bono counsel and amicus, we have concluded that we must respectfully disagree with this unbroken line of authority.

The announced purpose of Title VII was to eradicate discrimination; the goal of the 1972 amending legislation was to accord "[a]ggrieved [federal] employees or applicants the full rights available in the courts as are granted to individuals in the private sector under Title VII." S.Rep. No. 92–415, 92nd Cong., 1st Sess. at 16 (1971). Before passage of the enabling legislation, there was "serious doubt that court review [was] available to the aggrieved Federal employee." H.R.Rep. No. 92–238, 92d Cong., 1st Sess. at 25, *reprinted in* 1972 U.S.Code Cong. & Admin.News at 2137, 2160.

The Supreme Court has often emphasized the legislative design to ensure that federal employees have the same right to freedom from unlawful discrimination as do private sector employees. *See, e.g., Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976); *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Morton v. Mancari,* 417 U.S. 535, 547, 94 S.Ct. 2474, 2481, 41 L.Ed.2d 290 (1974).

■ The rights of federal employees do not, however, perfectly parallel those of private sector employees. Had Congress intended an exact parallel the 1972 amendments would have been far simpler: an added section stating that the federal government is an "employer." Such a choice was expressly rejected in the definitional section of Title VII. The United States is not an "employer" for purposes of the statute. *See* 42 U.S.C. § 2000e(b). Similarly, a federal agency is an "executive agency" under § 2000e–16(a) and not an "employer" under § 2000e(b). *See Dorsey v. Federal Reserve Bank of St. Louis,* 451 F.Supp. 683 (E.D.Mo.1978). Section 2000e–16(a) sets forth the limited categories of personnel who are covered by Title VII as amended. The provisions of Title VII that deal with "employers" and "employees" apply only to non-federal workers.

*Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), relied upon this distinction. Plaintiff was not permitted to press her suit against Congressman Passman under Title VII because she had not been hired in the "competitive service" of the federal government. *See* 42 U.S.C. § 2000e–16(a). "When § 717 was added to Title VII to protect federal employees from

discrimination," Justice Brennan wrote, "it failed to extend this protection to congressional employees such as petitioner who are not in the competitive service." 442 U.S. at 247 & n. 26, 99 S.Ct. at 2278 & n. 26. *See also Lawrence v. Staats,* 640 F.2d 427 (D.C.Cir.1981) ("excepted service employee" not covered by Title VII). The mandate expressed in the legislative history—to ensure that the federal government is an example to private employers—cannot be read to exceed the limiting language of § 2000e–16(a).

Because of these limiting precedents, Title VII can be applied to the military only if "military departments" in the statute includes the uniformed military. There is no jurisdictional basis other than § 2000e–16(a) to hold a federal government organization to the standards of Title VII.

Military policy presents the ultimate dilemma of § 2000e–16(a). In *Davis,* the dissenting Justices were concerned about the holding allowing plaintiff to bring her claim against a congressman under the Constitution. Yet gender bases for decisionmaking in the military run far deeper than the preference expressed in Congressman Passman's letter to Davis: "[I]t was essential that the understudy to my Administrative Assistant be a man." 442 U.S. 228, 230 n. 3, 99 S.Ct. 2264, 2269 n. 3, 60 L.Ed.2d 846 (1979). The American military has struggled for decades with the problem of whether and how to include women in its mission.

Women served in the United States armed forces with full military rank as long ago as the First World War, when about 13,000 women enlisted in the Navy, doing clerical work. *See* M. Binkin & S. Bach, *Women and the Military* 5 (1977). General Pershing argued unsuccessfully for the inclusion of women in the Army. *Id.* Women's auxiliary units were established during the Second World War. After the war, Congress institutionalized the role of women in the military. *See Women's Armed Services Integration Act of 1948,* Pub.L. No. 80–625, 62 Stat. 356 (not codified).

Provisions of the 1948 legislation illustrate the military policy of allowing women to participate while treating them differently from men. Women had to be older (18 rather than 17) and needed parental consent until reaching 21 (18 for men) in order to enlist. *See* 62 Stat. 357. Women could not serve above the rank of lieutenant colonel; this rule was changed by statute in 1967. *See* Pub.L. No. 90–130, 81 Stat. 374. The 1948 Act also provided separate criteria for male and female spouses to obtain military benefits: husbands had to demonstrate dependency. The Supreme Court later invalidated this disparate requirement. *See Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

These erosions of a discriminatory structure occurred with no invocation of Title VII. Military policy has never collided with Title VII in reported case law. Nevertheless in devising its administrative redress for grievances, the Army has distinguished between the uniformed military and civilian employees. *Compare* Army Regulation 600–21, attached as Exhibit B to Defendants' Rule 3(g) Statement (procedures for uniformed military complaining of discrimination) *with* 29 C.F.R. § 1613 (procedures for civilian employees). Defendants argue that this acknowledged "noncompliance with Title VII and its implementing regulations," which has continued with no criticism from Congress or the federal equal employment agencies, reflects an accurate perception in the Army that Title VII does not apply to the uniformed forces.

The language and legislative history of the statute provide no basis for this conclusion. It is a statute, not a perception, that we must interpret.

■ References in legislative materials indicate that the 1972 amendments to Title VII were intended to apply broadly. *See, e.g.,* H.R.Rep. No. 92–238, 92nd Cong., 2d Sess., *reprinted in* 1972 U.S.Code & Ad. News 2137, 2141 ("The time has come to bring an end to job discrimination once and for all, [for] every citizen...."); 118 Cong.

Rec. daily ed., Mar. 6, 1972 at 7166 ("opportunities for millions of Americans").

When Congress wanted to distinguish between uniformed and civilian employees of the military, it did so explicitly. For example, the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, defines "employee" as follows:

> The term employee ... means any individual employed by the Government of the United States ... as a *civilian* in the military departments (as defined in Section 102 of Title 5).

29 U.S.C. § 203(e)(2)(A)(i) (emphasis added). *See also* Civil Service Reform Act, 5 U.S.C. § 7103(a)(2) (" 'employee' means an individual employed in an agency ... but does not include ... a member of the uniformed services").

■ Congress has not, however, been consistent. In other statutes it explicitly included the uniformed military in definitions of employee. *See, e.g.,* Child Support Enforcement Act, 42 U.S.C. § 659(a). Whether this inclusion undercuts plaintiff's argument is not clear since employee is a term that must "be given its common everyday meaning." *Cobb v. Sun Papers,* 673 F.2d 337, 339 (11th Cir.), *cert. denied,* 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982) (construing Title VII).

As for the other ambiguous term in the statutes, "military departments," there is support for the view that these include the uniformed military. The first codified description of the Army, Navy, and Air Force as "military departments" was in the National Security Act Amendments of 1949, Pub.L. No. 81–216, 63 Stat. 578. That statute announced its purpose:

> to provide three military departments, separately administered, for the operation of the Army, the Navy ..., and the Air Force, with their assigned *combat* and service components ...

63 Stat. 578, 579 § 2 (emphasis added).

Nevertheless, defendants' position has strong historical support. While the original Civil Rights Act did not apply to the federal government, President Johnson's precursor to the 1972 amendments, did. Executive Order No. 11246 protected federal employees from discrimination on the basis of race, creed, color or national origin. Under the terms of the order, every federal agency head was required to "establish and maintain a positive program of equal employment opportunity for all *civilian* employees...." Executive Order No. 11246, 30 F.R. 12319 (emphasis added). An amendment to the Order added a prohibition against sex discrimination, but continued to limit coverage to civilians. *See* Executive Order No. 11375, 32 F.R. 14303. A superseding order, again using the restrictive term "civilian employees," explicitly stated that the Order applied to military departments. *See* Executive Order No. 11478, 34 F.R. 12985.

Arguably the congressional desire to merely codify Executive Order No. 11478 is reflected in the legislative history of the 1972 amendments. Because members of Congress did not discuss the impact or burden that the amendments would have on the federal government, it might be inferred that they assumed that the 1972 amendments were equivalent to Executive Order No. 11478. Assignment of enforcement responsibility to the Civil Service Commission also lends some support to the contention that Congress did not intend Title VII to apply to uniformed members of the military since the Commission has never involved itself with soldiers, sailors and airpersons.

Often repeated in the legislative history of the 1972 amendments was the fact that the new law would cover 2.6 million federal employees. 3 Legislative History of the Equal Employment Opportunities Enforcement Act of 1972 at 1760, S.Rep. No. 92–415 (118 Cong.Rec. daily ed., Feb. 22, 1972 at 4922.) At the time of the debate, there were 2.2 uniformed members of the military in excess of that number. A court in a similar case found this point persuasive. *See Johnson v. Hoffman,* 424 F.Supp. 490, 493 (E.D.Mo.1977), *aff'd sub nom. Johnson v. Alexander,* 572 F.2d 1219 (8th Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 579, 58

L.Ed.2d 658 (1978). The 2.6 million figure was apparently not accurate; it understated even the number of civilians covered by the 1972 amendments by disregarding Postal Service and Library of Congress workers. *See* Statistical Abstract of the United States, at 403–05 (U.S. Dep't of Commerce 1973).

The analysis of § 717 in the legislative history states that personnel actions within the competitive service or positions covered by the Civil Service Retirement Act are protected by the amendment. *See* H.R. Rep. No. 92–238, *reprinted in* 1972 U.S. Code Cong. & Ad.News at 2167. Although it does not say that members of the military are protected, section-by-section analysis is a brief summary of § 717 that does not purport to cover the entire language of the statute.

These arguments in both directions are undecisive, but they do demonstrate that the legislative history of 42 U.S.C. § 2000e–16 is unclear on whether Title VII applies to the uniformed military. Congress may have intended to except the uniformed military from coverage, but there is no evidence compelling this interpretation. The plainest rendering of the statute suggests that Title VII does not distinguish between uniformed employees and civilian employees.

Two decisions holding that Title VII does not apply to the uniformed military are illustrative of the prior line of cases. *See Gonzalez v. Department of the Army,* 718 F.2d 926 (9th Cir.1983); *Johnson v. Alexander,* 572 F.2d 1219 (8th Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978).

*Gonzalez* relied on a distinction "between 'military departments' [covered by § 2000e–16(a) ] and 'armed forces,' the former consisting of civilian employees, the latter of uniformed military personnel." 718 F.2d at 928. It supported this distinction by following legislative references in Title 5 and Title 10 of the United States Code. In the West edition, United States Code Annotated, a "Reviser's Note" states that the definition of military departments

in 5 U.S.C. § 102 "is supplied to avoid the necessity for defining 'military departments' each time it is used in this title. See section 101(7) of Title 10." At the onset it bears mention that the "Reviser's Note" was not, so far as we can determine, seriously reviewed by Congress. Section 101(7) is located near section 101(4), which has a separate definition of "armed forces." *See* 718 F.2d at 928.

Somewhat more persuasive than the Reviser's Note is a statutory provision of Title 10. It seems to lump civilian and military components into the term department since it provides:

> "Department," when used with respect to a military department, means the executive part of the department and all field headquarters, *reserve components, installation activities and functions under the control or supervision of the Secretary* of the department. . . .

10 U.S.C. § 101(5) (emphasis added). This broader definition of military departments specifically includes uniformed reserve units and undercuts substantially the distinction *Gonzalez* drew between "military departments" and "armed forces."

In other contexts, courts, including the Ninth Circuit, have found that "military departments" in other statutes includes members of the armed forces. *See, e.g., United States v. Weber Aircraft Corp.,* 465 U.S. 792, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984) (applying Freedom of Information Act); *Blevins v. Plummer,* 613 F.2d 767 (9th Cir.1980) (applying Privacy Act).

*Johnson v. Alexander,* a second appellate decision directly on point, held that a member of the uniformed military is not an "employee" for purposes of Title VII. It expressly did not use a civilian-noncivilian distinction, but offered little explanation for the holding. 572 F.2d at 1224.

Recent events have strengthened the view that membership in the armed forces is a form of employment. With the draft eliminated, and only a small fraction of personnel facing combat since the withdrawal from Vietnam, the peacetime mili-

tary's role as an employer has increased. The armed forces offer a unique compensation package: free health care, housing, and generous retirement annuities. Enlisted personnel are provided with hundreds of training courses, delivering solid experience for the civilian job market. *See* Goodman, *Women, War, and Equality: An Examination of Sex Discrimination in the Military,* 5 Women's Rights Law Rep. 243, 244 n. 15 (1979). Officers can study at civilian universities and receive valuable training—such as learning to fly a plane; more than eighty percent of America's well-paid commercial pilots received their pilot training in the Navy and Air Force. *Id.* at 244 n. 18.

Apart from the statistical analyses indicating that at both the officer and enlisted level, total benefits to those in the armed forces has risen to the point of approximate equality with civilian benefits, there is a highly significant advantage to females in the military. While civilian females lag well behind civilian males in annual earnings, in the military this disparity has been virtually eliminated. *See* M. Binkin & S. Bach, "Comparison of Mean Annual Earnings of Civilians with College Education, by Sex and Age, and Commissioned Officers, By Age," in *Women and the Military* 32 (1977).

More important from a national policy view is the military as "college for many of the Nation's poor." *See* Hearings on S.J. Res. 61 and S.J. 231 before the Senate Judiciary Comm., 91st Cong., 2d Sess. 320 (1970) (Equal Rights Amendment hearings). Plaintiff and others like her regard the Army as a source of improved future employment. For them the peacetime Army is a force against the circumstances in which societal discrimination has placed many American blacks and women.

Just as the military as employer offers some disadvantaged Americans a better chance than they can generally find in the civilian job market, the armed forces have often recently been more enlightened than civilian America in responding to discrimination. Before *Brown v. Board of Education* and in the days of Jim Crow segregation, in the early 1950's, the military instituted relatively successful integration throughout its ranks. This success helped to support national integration policies in later years. *See* J. Greenberg, Race Relations and American Law 369 (1950); J. Slonaker, *The U.S. Army and the Negro* vi (1971) ("The Army has been an active instrument of civil rights enforcement and an agent of social reform for the Negro."). This progressive and egalitarian tradition is an important and rather glorious part of our recent military history that cannot be buried under what the Second Circuit has called "unjustified presumptions of validity." *Crawford v. Cushman,* 531 F.2d 1114, 1121 (2d Cir.1976) (invalidating Marines policy of mandatory discharge of pregnant women).

Nor can the courts sidestep their duty to examine discrimination within the military and invalidate those instances of discrimination that conflict with the constitutional guarantee of equal protection. The equal protection clause of the Constitution applies to the military. *See Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Under the Fourteenth Amendment of the Constitution, Congress has the power to enforce constitutional rights. *See Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 15–16, 101 S.Ct. 1531, 1538–39, 67 L.Ed.2d 694 (1981); *Parden v. Terminal R. Co.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). "There is no dispute that in enacting the 1972 Amendments to Title VII to extend coverage to the States as employers, Congress exercised its power under § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer,* 427 U.S. 445, 453 n. 9, 96 S.Ct. 2666, 2670 n. 9, 49 L.Ed.2d 614 (1976). In the absence of a contrary decision by Congress, there is no reason for a military exception to the equal protection policies embodied in Title VII.

When Title VII and the equal protection clause both safeguard the right of

an individual to be free from discrimination, reliance on the statute rather than the Constitution is preferred. The Supreme Court has held that § 2000e–16 is the exclusive remedy for claims of discrimination in federal employment; if the statutory remedy were not exclusive, it would be driven "out of currency" in the presence of "other, less demanding" remedies. *Brown v. General Services Administration,* 425 U.S. 820, 833, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976). Title VII reflects the congressional intent to redress certain grievances with rigorous administrative procedure and judicial procedures.

Defendants gain some advantage from a construction of Title VII that would apply the statute to the uniformed military. If Title VII applies to the military, then it is the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown v. General Services Administration,* 425 U.S. 820, 829, 96 S.Ct. 1961, 1966, 48 L.Ed.2d 402 (1976). Title VII sweeps away other remedies an aggrieved member of the military might choose. Moreover, the great body of Title VII case law would provide clear standards for deciding discrimination cases, perhaps actually improving military effectiveness.

█ In summary, members of the armed forces are federal employees who share in all Americans' constitutional right to equal protection under the law. There is nothing in Title VII to suggest that the uniformed military are an exception to "members of military departments" expressly covered under § 2000e–16. Title VII is the exclusive judicial remedy for claims of sex discrimination brought by a member of the uniformed military.

### B. *Combat Exposure Risk as a Bona Fide Occupational Qualification*

An exception to Title VII that applies to the federal government as employer is known as the "BFOQ." If religion, sex, or national origin is a bona fide occupational qualification for a particular position, the employer may discriminate on that basis:

[An employer may employ an individual] on the basis of his religion, sex or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise....

42 U.S.C. § 2000e–2(e)(1).

No major country allows women in combat units in its standing armed forces. *See Rostker v. Goldberg,* 453 U.S. 57, 77 n. 12, 101 S.Ct. 2646, 2658 n. 12, 69 L.Ed.2d 478 (1981). The United States military is no exception. By federal statute, Navy "women may not be assigned to duty on vessels or in aircraft that are engaged in combat missions...." 10 U.S.C. § 6015. Women in the Air Force "may not be assigned to duty in aircraft engaged in combat missions." 10 U.S.C. § 8549. The Army and the Marines have by longstanding policy followed the same restriction.

When combat restriction laws were passed in 1948, the Army expressed its preference not to have such an explicit barrier because "the experts advise that modern warfare makes the entire United States vulnerable as a combat area in the future." *See* Testimony of Colonel Mary Hallaren, Director, Women's Army Corps, Hearings Before the Senate Armed Services Committee, *reprinted in* M. Binkin & and S. Bach, *Women and the Military* 26 (1977). Colonel Hallaren's testimony presaged the future problem, highlighted in this case, of separating combat from non-combat work in an institution dedicated to readiness for combat.

Sex discrimination in the form of combat restrictions is said to be widely supported by Americans. *See* S.Rep. No. 96–826, 96th Cong., 2d Sess. at 157, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 2612, 2647 (debate over Selective Service registration of women). We have found no challenge to the exclusion statutes in reported case law.

Despite modern combat exclusions, women have served in battlefields since Biblical days, when Deborah joined Barak in lead-

ing ten thousand men to victory against the Canaanites. *See* Judges 4:4–24. Other legends of women in battle abound. *See, e.g.,* M. Kingston, *The Woman Warrior* (1976) (China), N. Ireland, *Index to Women of the World* 414 (1970) (Molly Pitcher as cannoneer in Revolutionary War). The pioneer women who picked up rifles have been inscribed into our history by the cinema. Joan of Arc is as enduring a hero as any military man. For every Joan of Arc, however, there have been innumerable Joan Hills: women who would have been part of the prosaic millions of soldiers but who will not be permitted to fight, since the military establishment has excluded women from combat.

These antecedents show a fundamental conflict between modern ideas of equality and non-discrimination codified in Title VII, on the one hand, and the conviction that fighting wars is not the place of a woman, on the other. Title VII of the Civil Rights Act says that the federal government must not discriminate against females on the basis of sex; Title 10 of the United States Code, at sections 6019 and 8549, says that it must. The only reconciliation of the statutes involves an exception to Title VII.

▋ Title VII excludes from its coverage discrimination on the basis of religion, sex, or national origin where any of these criteria is a bona fide occupational qualification. The bona fide occupational qualification exception is invoked only after actual discrimination has been demonstrated. Here the Army's closing of the NBC position to women is not disputed. This discrimination makes the threshold showing needed to invoke a BFOQ inquiry.

▋ Congress intended the exception to justify a large range of employer decisions. *See, e.g.,* House Education and Labor Committee Report, H.R.Rep. No. 718, 89th Cong., 1st Sess. 5 (1965) (BFOQ meant to apply in "common circumstances, widely accepted by contemporary standards, where a reasonable good faith and justifiable ground exists to perpetuate occupational distinctions based upon sex"). Floor debate in both the House of Representa-

tives and the Senate indicated a concern that an occupational qualification exception was needed to protect reasonable employment decisions. *See* Sirota, *Sex Discrimination: Title VII and the Bona Fide Occupational Qualification,* 55 Tex.L.Rev. 1025, 1028–32 (1977).

Despite legislative support for a strong BFOQ exception, both the Equal Employment Opportunity Commission and the federal courts have interpreted the exception narrowly. The EEOC explicitly allows sex discrimination where the BFOQ is "authenticity," such as having only a male actor play a male role. There is also some endorsement of a BFOQ for "privacy" jobs such as locker room attendant. The EEOC tends to reject other proffered BFOQs, including customer preference and protective state labor laws. *See* 29 C.F.R. § 1604.-2(a).

The courts have established several alternative tests to determine whether a particular kind of sex discrimination represents a bona fide occupational qualification. *See Weeks v. Southern Bell Telephone and Telegraph Co.,* 408 F.2d 228, 235 (5th Cir. 1969); *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); *Rosenfeld v. Southern Pacific Co.,* 444 F.2d 1219 (9th Cir.1971). These tests, generally applied to private employers, emphasize the need for vigilance against stereotypical ideas of women's capacities.

▋ A federal regulatory barrier, unlike a stereotypical prejudice condemned by the *Weeks, Diaz,* and *Rosenfeld* courts, may be a BFOQ. It is clear that state legislation in conflict with Title VII is void under the supremacy clause. *See United States v. City of Chicago,* 549 F.2d 415, 438 (7th Cir.1977); *Rosenfeld v. Southern Pacific Telephone,* 444 F.2d 1219, 1225 (9th Cir.1971); *San Francisco Police Officers Association v. City and County of San Francisco,* 621 F.Supp. 1225, 1226 (N.D. Cal.1985). A federal statute is crucially different from a state law. Title VII does not nullify the federal statutory discrimina-

tion that prohibits women of the Navy and the Air Force from combat positions.

■ By extension, the Army policy on women in combat, though not codified by Congress, should be accorded the weight of a statute. Like the Air Force and Navy policies, the Army rule has gone unchallenged in the courts, and has been followed with the full deference paid to federal law. To treat the Army differently from the Navy and the Air Force would be to draw a distinction that has never had any practical significance.

■ Because combat risk is an occupational qualification mandated by statute, it is an appropriate BFOQ exception to Title VII.

### C. *The Role of Federal Civilian Courts in Applying Title VII to the Military*

The military enjoys wide latitude in making decisions concerning combat readiness. *See Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) ("judges are not given the task of running the Army"). Where to place the limits of this deference has long troubled the federal judiciary.

One test was announced in *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971), where the Fifth Circuit announced four criteria for determining whether federal courts should exercise their powers to review a military action:

(1) the nature and strength of plaintiff's claim;

(2) potential injury to the plaintiff if review is refused;

(3) the type and degree of anticipated interference with military functions; and

(4) the extent to which military expertise or discretion exists.

*Id.* at 201–02. Although *Mindes* was brought under the Constitution, its analysis is relevant in a Title VII context where questions of deference may affect the exercise of jurisdiction. The *Mindes* analysis has been widely employed. *See, e.g., Navas v. Gonzalez Vales,* 752 F.2d 765, 769

(1st Cir.1985); *Penagaricano v. Llenza,* 747 F.2d 55, 60 (1st Cir.1984); *Nieszner v. Mark,* 684 F.2d 562 (8th Cir.1982), *cert. denied sub. nom. Nieszner v. Orr,* 460 U.S. 1022, 103 S.Ct. 1273, 75 L.Ed.2d 494 (1983); *Lindenau v. Alexander,* 663 F.2d 68, 71 (10th Cir.1981); *Schlanger v. United States,* 586 F.2d 667, 671 (9th Cir.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Silverman v. Middendorf,* 422 F.Supp. 471 (S.D.N.Y.1976), *aff'd,* 553 F.2d 94 (2d Cir.1977).

The Second Circuit has often expressed difficulty in determining when federal courts should review military decisions. *Compare Katcoff v. Marsh,* 755 F.2d 223–34 (2d Cir.1985), (Army action "should be treated as presumptively valid") *with Crawford v. Cushman,* 531 F.2d 1114, 1121 (2d Cir.1976) ("appellant's claims must be evaluated in relation to the specific military justifications alleged here ... without unjustified presumptions of validity ..."). Reluctance to interfere is apparent:

> We do not say that a case could never arise where [an Army decision] could be invalidated by a civilian court.... But any such judicial intrusion into the area broadly confided by the Constitution to the President as commander-in-chief and his authorized subordinates must await a [strong] case....

*Cortright v. Resor,* 447 F.2d 245, 246 (2d Cir.1971) (Friendly, Ch.J., for a divided panel), *cert. denied sub nom. Cortright v. Froehlke,* 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972). Although the Second Circuit has never explicitly accepted the four-part *Mindes* test, its sentiments expressed in these cases comport with the philosophy of balancing expressed in *Mindes.*

The rights of individuals in the military are considered in light of the military's need for discipline, with the result that the military is not required to be as tolerant and liberal as a civilian organization. As Justice Rehnquist recently wrote for the Supreme Court, "to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de

corps." *Goldman v. Weinberger,* —— U.S. ——, ——, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). Various liberties and freedoms accorded to civilians can be lost to members of the armed forces under the prevailing deferential standard of review. *See, e.g., id.* (upholding regulation challenged as violative of First Amendment); *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (uniformed military cannot sue superior officers for injuries sustained as a result of race discrimination); *Parker v. Levy,* 417 U.S. 733, 743–44, 94 S.Ct. 2547, 2555–56, 41 L.Ed.2d 439 (1974)) (upholding conviction of serviceman for denouncing Vietnam war in speeches).

This line of Supreme Court cases, while developed in response to constitutional rather than statutory challenges of military decisions, sheds light on the instant case, where plaintiff has alleged unequal treatment on the basis of her sex. Whatever the jurisdictional basis of an action may be, the need for considerable deference to military requirements remains constant.

Title VII would respect the disciplinary relationships of military life if it is read as not supporting actions at law by a subordinate against a superior officer for injuries resulting from official orders. Such a reading of Title VII follows the point made in *Chappell v. Wallace:*

> [Discipline] becomes imperative in combat, but conduct in combat inevitably reflects the training that procedes combat; for that reason, centuries of experience has developed a hierarchial structure of discipline and obedience to command, unique in its application to the military establishment and wholly different from civilian patterns.

103 S.Ct. at 2365. The wrong alleged in *Chappell* was race discrimination in work assignments and job evaluations by superior officers. A similar complaint could be made alleging sex discrimination. Title VII, however, cannot intrude in this intimate and daily military relationship, which is characterized by "the subordination of the desires and interests of the individual to the needs of the service." *Orloff v.*

*Willoughby,* 345 U.S. 83, 92, 73 S.Ct. 534, 539, 97 L.Ed. 842 (1953).

■ In exercising its Title VII jurisdiction, then, the courts must take care not to second-guess day-to-day decisions crucial to disciplinary relationships. Interference with the field decisionmaking authority of superior officers would undermine the military function. For this reason isolated individual allegations of discrimination are best left to intramilitary review.

A central, national policy decision, by contrast, calls for a lesser measure of deference but some deference nonetheless. The military needs the freedom to be wrong, to change its mind. Unredressed injury may warrant intervention, but policy decisions, subject to change, characterize all active organizations and must develop freely.

■ For policy decisions, the test for judicial intervention in a Title VII dispute is whether the military decision was clearly arbitrary and erroneous, with a harmful effect present at the time the dispute reaches the court. A "clearly erroneous" inquiry allows the armed forces necessary flexibility to make changes and alter policy.

## III. THE MERITS OF THE RECLASSIFICATION

What now remains, in the *Mindes* analysis, is an evaluation of "the nature and strength of plaintiff's claim." *Mindes v. Seaman,* 453 F.2d 197, 201 (5th Cir.1971).

The critical factual question is whether the Army clearly acted in bad faith in classifying the NBC Specialist position as a combat job. The thirteen-month closure, according to plaintiff, was a bad faith aberration. She maintains that the national election returns of 1980 justified and fomented a prejudice against women in the Army, and encouraged discriminatory methods of keeping women out of promising military careers. There is no support for this contention in the record.

General Hines's study sorted Army positions into categories based on the chances

that a soldier in that category would enter into combat. An NBC Specialist is part of a unit, or force of soldiers, with combat-related duties. Defendants offered the following sample table of an infantry unit:

Infantry Unit—Table of Organization

| Line | Title | Duties | Number of Positions |
|------|-------|--------|---------------------|
| (1) | Commander | Command | 1 |
| (2) | Adjuncts | Assist Command | 2 |
| (3) | NCO | Assist Command and Control Troops | 6 |
| (4) | NBC Specialist | Conduct Decontamination in Front Lines | 4 |
| (5) | Medic | Provide Medical Care in Front Lines | 1 |
| (6) | Rifleman | Close With and Kill Enemy | 100 |
| | | Total Unit Component | 114 |

Within this framework, General Hines considered the mission of each unit in the entire active Army, the duties of each specialist, the battlefield location of the line within the unit, and the Army tactical doctrine applicable to the line, to determine the combat-likelihood category of each position. Seven levels of risk, labeled P1 through P7, were drawn up. The Army then considered the effect of closing various levels of combat-risk categories to women. It decided to close only the highest-risk category, P1.

The NBC Specialist position fell within all seven categories, because of the other variables considered in determining combat likelihood. At the entry level, 1429 NBC Specialists were authorized. Of these 1429 privates, 1385 were classified at P1, the highest likelihood of entering into combat. Only 44 places remained open to women, and the Army determined that 43 places had to be filled by men to ensure combat replacements. Concluding that the NBC Specialist position did not offer enough promotional opportunity because of this narrow opening, General Hines recommended that the NBC Specialist position be closed to women.

■ Plaintiff cogently points out several flaws in this procedure. General Hines' study on the role of women in the Army might well have been requested in part because some male commanders felt un-

easy about this changing and growing role. Long-range weapons have made the concept of "front lines" somewhat obsolete. Some of the study's decisions regarding the use of statistical and other data are debatable. Women had little input in the study. These complaints are provocative and at least some were apparently considered by the Army. They do not make out a claim of unlawful discrimination.

The Army's subsequent reopening of the NBC specialist position to women does not suggest that the closure was discriminatory. Expansion in entry-level positions opened more places that could be filled by women while ensuring combat replacements. The relatively prompt reclassification to permit entry of women suggests good faith on the part of the Army.

The serious problems in changing the whole armed forces from a segregated organization, whether it is black-white or male-female, to an unsegregated one, are great. Such a radical restructuring requires education, many studies and reports and will necessarily, in the course of the change, result in errors. Here, assuming there was an error, it was promptly corrected.

IV. DECLARATORY RELIEF

Plaintiff seeks relief in the form of a declaration that defendants discriminated against her on the basis of sex. She urges that such a declaration would assist in her future search for employment, to show that the brevity of her stint in the Army Reserves did not reflect a lack of talent or diligence.

■ Even if such a declaration would please an employer—a dubious assertion—plaintiff and defendant have long terminated their relationship, and there is no ongoing controversy amenable to declaratory relief. The NBC Specialist position is now open to women; plaintiff has shown no desire to reenlist, and she does not represent a class. Moreover, she has received an honorable discharge.

Any declaration would speak to an event that is now moot. *See Aetna Life Insurance of Hartford v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). A declaratory judgment must be denied.

## V. CONCLUSION

The military must be held to the standards and goals of Title VII, but it is entitled to have its need for discipline recognized by civilian courts. It may exclude women from combat and combat support positions, because being male is a bona fide occupational qualification for a job that is by federal law and present national policy restricted to men. Under Title VII, the federal courts have jurisdiction to review the classification of a position as combat or combat supported. The classification in this case was valid.

Summary judgment is granted in favor of all defendants with no costs or disbursements.

So ordered.