# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 4, 2019      Decided February 14, 2020

No. 18-5180

GARY L. JACKSON,
APPELLANT

v.

THOMAS B. MODLY, ACTING SECRETARY, THE UNITED
STATES DEPARTMENT OF THE NAVY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-02186)

*Anthony F. Shelley*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With him on the briefs was *Dawn E. Murphy-Johnson*.

*Gary L. Jackson*, *pro se*, was on the briefs for appellant.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jessie K. Liu*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Rhonda L. Campbell*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Gary L. Jackson served in the United States Marine Corps from 1977 to 1991. Almost thirty years after his honorable discharge from the Marine Corps, Jackson filed a pro se complaint against the Secretary of the Navy (Secretary) alleging that toward the end of his military career, his supervising officers discriminated against him because of his race and sex (he is a black male) in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq*. In addition to Jackson's Title VII claim, the district court inferred other claims from his pro se complaint, including one under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and another under the Military Pay Act, 37 U.S.C. § 204. The district court ultimately dismissed all of Jackson's claims and Jackson now appeals.

As detailed below, we join the unanimous rulings of our sister circuits, concluding that Title VII does not apply to uniformed members of the armed forces, and therefore affirm the dismissal of Jackson's Title VII claim. We also affirm the dismissal of Jackson's APA claim because it is untimely and the facts alleged in the complaint are insufficient to apply equitable tolling. In so holding, we also recognize that our long-standing interpretation of the six-year statute of limitations in 28 U.S.C. § 2401(a) as jurisdictional is no longer correct in light of the United States Supreme Court's decision in *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015). And, last, we conclude that we lack jurisdiction to review the dismissal of Jackson's Military Pay Act claim.

## I. BACKGROUND

This case involves Jackson's claims of discrimination that he allegedly suffered toward the end of his service with the United States Marine Corps. Jackson served from 1977 until his honorable discharge on January 15, 1991. His complaint alleges that in 1988, while he was stationed at Henderson Hall, Marine Corps Headquarters in Arlington, Virginia, assigned to the Warehouse Chief position, he began to experience discrimination, harassment and retaliation from his superiors. For example, Jackson alleges that one of his superiors relocated him to another section of the warehouse stating that he "preferred that the number of Blacks not exceed the number of whites in any one section of the Warehouse." Compl. 9. He also alleges that, among other things, his superiors intentionally delayed responding to his request to attend a training academy, placed false accusations in his military record and went to extraordinary lengths to prevent his reenlistment. Jackson alleges that, upon his discharge, one of his superiors said to another, "we finally got Staff Sergeant Jackson . . . That's one less Black Staff Sergeant." *Id.* After his discharge, Jackson alleges that he filed applications with the Board for Correction of Naval Records multiple times from 1990 until 2000 to remove derogatory material from his fitness record and thus make him eligible for reenlistment but his attempts were unsuccessful.

On November 19, 2014, Jackson filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) against the Marine Corps. The EEOC responded that it lacked jurisdiction because Jackson's complaint was against a branch of the military and therefore had to be filed initially with the Marines Corps. On December 9, 2014, Jackson filed his employment discrimination claim with the Equal Employment Opportunity Office of the Marine

Corps (EEO Office). The EEO Office dismissed his complaint under 29 C.F.R. § 1614.103(d)(1), stating that uniformed military personnel of any branch of the armed forces are not covered by Title VII. Jackson then appealed to the EEOC. The EEOC affirmed the EEO Office's decision on July 19, 2016, also relying on § 1614.103(d)(1), and denied Jackson's subsequent request for reconsideration.

On November 2, 2016, Jackson filed a pro se complaint in district court, alleging employment discrimination against the Secretary under Title VII. The Secretary moved to dismiss Jackson's complaint under Federal Rule of Civil Procedure 12(b)(1) and Rule 12(b)(6). The district court granted the motion, dismissing Jackson's claims under Rule 12(b)(1) for lack of subject matter jurisdiction. *Jackson v. Spencer*, 313 F. Supp. 3d 302, 311 (D.D.C. 2018). Construing Jackson's pro se complaint in the most favorable light, the district court inferred additional claims under the Military Whistleblower Protection Act, the Administrative Procedure Act (APA), the Military Pay Act and the Federal Tort Claims Act (FTCA). *Id.* at 308. The district court dismissed all of Jackson's claims, holding that Title VII did not apply to uniformed members of the armed forces, that the Military Whistleblower Protection Act does not contain a private right of action and that his other claims were untimely. *Id.* at 308–11.

Jackson appealed pro se. We appointed counsel as amicus to address whether Title VII applies to uniformed members of the armed forces. Amicus for Jackson (Amicus) raises arguments supporting Jackson's Title VII, APA and Military Pay Act claims.[1]

---

[1] We thank Amicus for the outstanding effort—both on brief and in argument—and have found it to be of great assistance.

## II. ANALYSIS

### A. Title VII

We begin with the district court's dismissal of Jackson's Title VII claim. Although the district court dismissed Jackson's Title VII claim for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the district court should have dismissed the case for failure to state a claim pursuant to Rule 12(b)(6).[2] We review the district court's dismissal for failure to state a claim under Rule 12(b)(6) de novo, "taking as true the allegations of the complaint." *True the Vote, Inc. v. IRS*, 831 F.3d 551, 555 (D.C. Cir. 2016).

"Title VII of the Civil Rights Act of 1964 reflects the American promise of equal opportunity in the workforce and shields employees from certain pernicious forms of

---

[2] In *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514–16 (2006), the Supreme Court held that Title VII's threshold requirement that an "employer" have at least fifteen employees is not jurisdictional but instead relates to the substance of the plaintiff's claim for relief. The Court reasoned that Title VII's jurisdictional provision merely requires that a claim be "brought under" that Title and held that, if a restriction like the fifteen-employee threshold for employers under Title VII is not "clearly state[d]" as jurisdictional, "courts should treat the restriction as nonjurisdictional in character." *Id.* at 515–16. Here, just as the issue of whether a person is an "employer" subject to the requirements of Title VII is nonjurisdictional, so is the issue of whether a person is a covered "employee." Nothing about Title VII's definition of employee or its provision extending protection to federal employees "clearly states" that such provisions are intended to be jurisdictional. *See id.* at 515; 42 U.S.C. §§ 2000e(f), 2000e-16(a). The Secretary's argument that Jackson is not entitled to the protections of Title VII as a uniformed member of the armed forces amounts to an argument that Jackson's complaint fails to state a claim for relief.

discrimination." *Figueroa v. Pompeo*, 923 F.3d 1078, 1082–83 (D.C. Cir. 2019) (citation omitted).  As originally enacted, Title VII did not apply to the federal government.  *Barnes v. Costle*, 561 F.2d 983, 988 (D.C. Cir. 1977).  In 1972, however, the Congress extended the protections of Title VII to federal as well as state and local employees in the Equal Employment Opportunity Act of 1972, Pub. L. No. 92–261, § 11, 86 Stat. 103, 111–13 (codified at 42 U.S.C. §§ 2000e–16).  As a result, Title VII now provides, as relevant here, that "[a]ll personnel actions affecting employees or applicants for employment . . . in military departments as defined in section 102 of Title 5" and other federal departments "shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).

The issue before us is whether Title VII, specifically, the provision covering federal employees, § 2000e-16(a), applies to uniformed members of the armed forces of the United States military.  We have never squarely addressed this issue.  *But see Milbert v. Koop*, 830 F.2d 354, 358 (D.C. Cir. 1987) (assuming *arguendo* Title VII does not apply to members of armed forces).  But we note at the outset that every one of our sister circuits to address this question has concluded—albeit based on varying rationales and depths of analysis—that the answer is no.  *See, e.g.*, *Brown v. United States*, 227 F.3d 295, 299 (5th Cir. 2000); *Coffman v. Michigan*, 120 F.3d 57, 59 (6th Cir. 1997); *Randall v. United States*, 95 F.3d 339, 343 (4th Cir. 1996); *Stinson v. Hornsby*, 821 F.2d 1537, 1539 (11th Cir. 1987), *cert. denied*, 488 U.S. 959 (1988); *Roper v. Dep't of the Army*, 832 F.2d 247, 248 (2d Cir. 1987); *Salazar v. Heckler*, 787 F.2d 527, 530 (10th Cir. 1986); *Gonzalez v. Dep't of the Army*, 718 F.2d 926, 928–29 (9th Cir. 1983); *Johnson v. Alexander*, 572 F.2d 1219, 1224 (8th Cir.), *cert. denied* 439 U.S. 986 (1978).

With this unanimous precedent from our sister circuits in mind, we begin our analysis with the text. *See S.C. Pub. Serv. Auth. v. F.E.R.C.*, 762 F.3d 41, 55 (D.C. Cir. 2014) (per curiam) ("In addressing issues of statutory interpretation, the court must begin with the text, turning as need be to the structure, purpose, and context of the statute."); *Janko v. Gates*, 741 F.3d 136, 139–40 (D.C. Cir. 2014). Here, the relevant text of Title VII provides that "employees or applicants for employment . . . in military departments as defined in section 102 of Title 5. . . shall be made free from" unlawful discrimination. 42 U.S.C. § 2000e-16(a).

At the outset of our textual analysis, we clarify—and ultimately reject—a textual hook other courts and the Secretary here erroneously rely upon to reach the conclusion that Title VII does not include uniformed members of the armed forces—namely, the term "military departments." The argument is based on Title VII's reference to the definition of military departments in section 102 of Title 5 of the United States Code, which organizes the federal government. *See* 5 U.S.C. §§ 101, *et seq*. Title 5 defines "military departments" as "The Department of the Army. The Department of the Navy. The Department of the Air Force." *Id.* § 102. Title 10 of the United States Code—codifying the Congress's structuring of the military—has the same definition of "military departments." 10 U.S.C. § 101(a)(8). Both Title 5 and Title 10 separately define the "*armed forces*" as "the Army, Navy, Air Force, Marine Corps, and Coast Guard." 5 U.S.C. § 2101(2); 10 U.S.C. § 101(a)(4). Thus, other courts and the Secretary here conclude that, because the Congress treats "military departments" and "armed forces" as distinct terms, uniformed members of the armed forces are not covered by Title VII. *See, e.g.*, *Gonzalez*, 718 F.2d at 928 ("The two differing definitions show that Congress intended a distinction between 'military departments' and 'armed forces,' the former consisting of

civilian employees, the latter of uniformed military personnel.").[3]

In fact, a quick review of the Congress's structuring of the military in Title 10 shows that uniformed members of the armed forces are within the umbrella of the military departments. Several Title 10 provisions make clear that the term "armed forces" refers to the uniformed fighting forces within the three "military departments." *See* 10 U.S.C. § 101(a)(6) (defining "'department,' when used with respect to a military department" as including, inter alia, "the executive part of the department and all . . . forces"); *id.* § 7062(b) ("[T]he Army, within the Department of the Army, includes land combat and service forces and such aviation and water transport as may be organic therein."); *id.* § 8061(4) ("The Department of the Navy is composed of . . . [t]he entire operating forces, including naval aviation, of the Navy and of the Marine Corps, and the reserve components of those operating forces."). For example, the "Department of the Army" contains both civilian employees as well as the "Army"—defined as "combat and service forces."[4] *See id.* §§ 101(a)(6), 7062(b). Thus, the military departments contain both civilian employees and the armed forces, *see Johnson*, 572 F.2d at 1224 ("The great 'military

---

[3] It appears that other courts took the Ninth Circuit's erroneous textual distinction in *Gonzalez*, 718 F.2d at 928, at face value without conducting their own textual analysis and based their decisions at least in part on that reasoning. *See, e.g.*, *Roper*, 832 F.2d at 248; *Brown*, 227 F.3d at 298 n.3; *Randall*, 95 F.3d at 343.

[4] "The Marine Corps is an organization within the Department of the Navy, which is one of the 'military departments' which Congress has defined. The Coast Guard is a military service and one of the armed forces of the United States which serves as a component of the Navy in time of war or when the President so directs." *Johnson*, 572 F.2d at 1224 n.5.

departments'. . . referred to in 5 U.S.C. § 102 include not only uniformed personnel of various ranks and grades but also of thousands of men and women employed in civilian capacities."), and, accordingly, that term on its own, contrary to what other courts have concluded, in fact supports an interpretation that Title VII covers uniformed members of the armed forces.

Nevertheless, our analysis does not stop with the term "military departments." The Congress specifically chose to say "*employees . . .* in military departments *as defined in section 102 of Title 5.*" 42 U.S.C. § 2000e-16(a) (emphases added). The reference to section 102 of Title 5 is significant. First, the Congress explained that the civil-service legislation creating section 102, along with the rest of Title 5, was enacted to codify "the general and permanent laws relating to the organization of the Government of the United States and to its *civilian officers and employees.*" Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378 (emphasis added). The Congress could have chosen to define "military departments" with reference to section 101 of Title 10 that organized the United States military several years earlier, *see* Act of Aug. 10, 1956, Pub. L. No. 1028, 70A Stat. 1, 3–4, 84 Cong. Ch. 1041, but instead it chose to reference the title that was codified to organize the civilian officers and employees of the United States government. This choice, albeit not conclusive, is one indication that the Congress was referring to civilian employees within the military departments by referencing Title 5.

Second, and more importantly, in the same legislation that defined "military departments" under section 102 of Title 5, the Congress also defined "employees" under that title. *See* § 2105, 80 Stat. at 409. It defined "employee" as "an officer and an individual who is—(1) appointed in the civil service" by one of the various persons listed under that

provision. 5 U.S.C. § 2105(a). It defined "civil service" as consisting of "all appointive positions in the executive, judicial, and legislative branches of the Government of the United States, *except positions in the uniformed services*." *Id.* § 2101(1) (emphasis added). "[U]niformed services" means "*the armed forces*, the commissioned corps of the Public Health Service, and the commissioned corps of the National Oceanic and Atmospheric Administration." *Id.* § 2101(3) (emphasis added). Putting all of these provisions together, we believe the Congress provided that "employees" in the "civil service" of the United States do not include the "armed forces." Therefore, when the Congress amended Title VII against this backdrop six years later, § 11, 86 Stat. at 111–13, and specifically referenced section 102 of Title 5, it extended Title VII protections only to federal civilian employees within the military departments, not members of the armed forces that it considered to be outside the definition of employees in the federal civil service.

It is true that Title VII has its own definition of "employee," which it generally defines as "an individual employed by an employer." 42 U.S.C. § 2000e(f). The Congress did not amend that definition in 1972 when it added federal employees to Title VII. But it likely saw no need to make a change. As manifested by Title 5's definitions, it did not consider members of the armed forces to be federal employees within the civil service. Moreover, looking to Title 5's definition of employee to determine whether the Congress intended to include uniformed members of the armed forces under Title VII does not change the broad general definition of employee under Title VII; rather, it indicates that the Congress did not consider a uniformed member of the armed forces to be "an individual employed by an employer" within that general definition in setting Title VII's scope. *Id.*

Amicus argues that our reliance on Title 5's definition of employee is barred by our decision in *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979). Not so. In *Spirides*, we considered whether the plaintiff, who worked as a foreign language broadcaster for the Greek Service (a division of the United States International Communication Agency), was an "employee" covered by Title VII or an independent contractor. *Id.* at 827–30. In doing so, we rejected the defendant's exclusive reliance on the definition of employee found in the civil service laws of Title 5 because independent-contractor status "calls for application of the general principles of the law of agency." *Id.* at 831. There is no assertion here, however, that Jackson is an independent contractor, nor was Spirides a member of the armed forces. In this case, we look to the definition of employee in Title 5 not to displace the test for distinguishing independent contractors from employees but to determine whether "employees" in § 2000e-16(a) encompass uniformed servicemembers. Crucially, the Congress specifically chose to reference the civil service laws for "employees or applicants for employment . . . in military departments." 42 U.S.C. § 2000e-16(a). Thus, Title VII defines military departments by express reference to the civil service laws. Put differently, unlike in *Spirides*, here we have reason to look to the definition of employee in Title 5 because the Congress explicitly directed us there.

The Congress's incorporation of the civil service definition of employee in Title 5, which does not cover uniformed members of the armed forces, comports with the unique nature of the armed forces as composed of "individual[s]" not "employed by an employer" within the meaning of Title VII. 42 U.S.C. § 2000e(f). When compared to traditional civilian employment, military service differs substantially. Those differences show that, at least in the

context of Title VII, uniformed members of the armed forces are not "employees" as defined by the statute. *See id.*

First, the manner in which uniformed members of the armed forces and the military terminate the work relationship is different from normal employment.[5] Uniformed members of the armed forces are not free to leave their positions in the military in most instances. *See Johnson*, 572 F.2d at 1223 n.4 ("An enlisted man in the Army, for example, is not free to quit his 'job,' nor is the Army free to fire him from his employment."). If an enlisted serviceman or a commissioned officer attempts to leave the military or refuses to work before the required time of service is completed, he can be punished by court-martial. *See, e.g.*, 10 U.S.C. §§ 886, 890, 892. Such a court-martial can result in imprisonment, *see e.g.*, *Ortiz v. United States*, 138 S. Ct. 2165, 2168 (2018) ("Courts-martial try service members . . . and can impose terms of imprisonment . . ."); *United States v. Sanchez-Cortez*, 530 F.3d 357, 358–59 (5th Cir. 2008) (per curiam) (criminal defendant had previously been convicted and imprisoned by court-martial for 114 days' confinement for being absent without leave in violation of 10 U.S.C. § 886 (Art. 86 of the Uniform Code of Military Justice)), and, during times of war, desertion or attempted

---

[5] In this discussion, we borrow two factors we have previously used to distinguish between employees and independent contractors—the manner in which the work relationship is terminated and the intention of the parties—to emphasize the uniqueness of military service when compared to civilian employment. *See Spirides*, 613 F.2d at 831. Of course, for the reasons explained *supra*, the employee versus independent contractor analysis in *Spirides* is different from the issue before us. Nevertheless, we find two of the factors from that analysis particularly helpful here to highlight how military service differs from the typical employment relationship.

desertion can even result in the death penalty,[6] 10 U.S.C. § 885(c). We can think of no other occupation in which these types of restrictions are placed upon terminating the work relationship.[7] *See Brown v. Glines*, 444 U.S. 348, 354 (1980) ("The military is, 'by necessity, a specialized society separate from civilian society.'" (quoting *Parker v. Levy*, 417 U.S. 733, 743 (1974))).

Second, the parties here—service members and the government—intend their relationship to be distinct from traditional employment. Members of the armed forces volunteer to serve in the military, understanding that they must complete their service with all of its burdens, sacrifices and duties or face possible loss of liberty. Likewise, the government expects that uniformed members will complete their duties and follow orders and will not hesitate to enforce the consequences of members failing to do so. *Id.* ("To ensure that they always are capable of performing their mission

---

[6] The last time the United States executed a soldier for desertion was 1945. *See* Lieutenant Commander Rich Federico, *The Unusual Punishment: A Call for Congress to Abolish the Death Penalty Under the Uniform Code of Military Justice for Unique Military, Non-Homicide Offenses*, 18 Berkeley J. Crim. L. 1, 21 (2013) ("The last soldier executed for desertion was Private Eddie Slovik in 1945."). Still, the fact remains that unlike other jobs, if a soldier attempts to leave the military in certain contexts, the consequence can be loss of freedom or even life.

[7] Amicus argues that professional basketball star LeBron James is not free to leave one team and play for another under the National Basketball Association's rules and that federal employees can be required to work during government shutdowns. But Amicus misses the point. It is the threatened loss of liberty—or even life—that makes the relationship between uniformed members and the government in military service unique. LeBron James may be contractually barred from joining another team but he will not be jailed for walking off the court.

promptly and reliably, the military services 'must insist upon a respect for duty and a discipline without counterpart in civilian life.'" *Id.* (quoting *Schlesinger v. Councilman*, 420 U.S. 738, 757, (1975))).

Other aspects of military service make it unique from traditional employment. Although uniformed members currently volunteer to serve, were the government to re-institute the draft pursuant to the Selective Service Act, individuals could be forced to join the military. *See United States v. Nugent*, 346 U.S. 1, 9 (1953) ("The Selective Service Act is a comprehensive statute designed to provide an orderly, efficient and fair procedure to marshal the available manpower of the country, to impose a common obligation of military service on all physically fit young men."). Additionally, members of the armed forces are subject to a different set of laws and justice system from those governing civilian employees. *See Johnson,* 572 F.2d at 1223 n.4 ("[T]he soldier is subject not only to military discipline but also to military law."); *Parker*, 417 U.S. at 751–52 (discussing "very significant differences between military law and civilian law and between the military community and the civilian community" under Uniform Code of Military Justice). We therefore agree with the Eighth Circuit's reasoning that, because military service "differs materially" from "ordinary civilian employment," uniformed members of the armed forces are not employed by the government within the meaning of Title VII. *Johnson*, 572 F.2d at 1223–24.

We do not, of course, hold today that, because military service is distinct from traditional employment, the military is free to discriminate. Indeed, pursuant to Marine Corps Order (MCO) 5354.1E, the military is prohibited from engaging in unlawful discrimination, including in the employment

context.[8] *See* MCO 5354.1E vol. 2, ¶ 0108 (June 15, 2018). Likewise, we do not hold that, because military service is unique, uniformed members of the armed forces can never be considered "employees" of the federal government. The Congress is free to so define them. Here, it has not done that. In fact, it has done the opposite—the text, structure and context of § 2000e-16(a) demonstrate that the Congress did not intend uniformed members of the armed forces to come within the protections of Title VII.

Apart from the text and structure of Title VII, we also must take into account that every circuit court of appeals to address

---

[8] MCO 5354.1E provides in relevant part:

0108 UNLAWFUL DISCRIMINATION

Any conduct whereby a Service member or DOD employee knowingly and wrongfully and without proper authority but with a nexus to military service treats another Service member or DOD employee adversely or differently based on race, color, national origin, religion, sex (including gender identity), or sexual orientation [constitutes unlawful discrimination]. Unlawful discrimination includes actions or efforts that detract from equal opportunity, with respect to the terms, conditions, or privileges of military service including, but not limited to, acquiring, assigning, promoting, disciplining, scheduling, training, compensating, discharging, or separating. This definition excludes justifiable conduct that discriminates on the basis of characteristics (including, but not limited to, age, height, and weight) that serve a proper military or other governmental purpose as set forth in other military policies.

MCO 5354.1E vol. 2, ¶ 0108 (June 15, 2018).

this issue since 1978 has held that uniformed members of the armed forces are not included within the protections of Title VII,[9] *see, e.g., Brown*, 227 F.3d at 298 n.3 (collecting cases); in addition, the Congress has never amended Title VII to add uniformed members of the armed forces to the statute. The Supreme Court has held that "Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that 'Congress at least acquiesces in, and apparently affirms, that [interpretation].'" *Monessen Sw. Ry. Co. v. Morgan,* 486 U.S. 330, 338 (1988) (quoting *Cannon v. Univ. of Chicago,* 441 U.S. 677, 703 (1979))). This indication is particularly strong if evidence exists of the Congress's awareness of and familiarity with such an interpretation. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599–602 (1983).

Although we recognize the limited value of congressional acquiescence as an interpretive tool, *see Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994), we nevertheless find the Congress's inaction for over forty years particularly significant for a couple of reasons. First, the Congress has amended various parts of Title VII over the years, including the specific provision at issue here, 42 U.S.C. § 2000e-16(a), *see* Pub. L. No. 104–1, § 201, 109 Stat. 3 (1995); Pub. L. No. 105–220, § 341, 112 Stat. 936 (1998), but has never sought to override our sister circuits' determination that uniformed members of the armed forces are not included under Title VII.[10] *See Merrill Lynch, Pierce,*

---

[9] The only court to conclude otherwise was the Eastern District of New York in *Hill v. Berkman*, 635 F. Supp. 1228, 1238 (E.D.N.Y. 1986). That decision was later reversed by the Second Circuit. *See Roper*, 832 F.2d at 248.

[10] We also note that our sister circuits have interpreted other federal anti-discrimination laws in addition to Title VII not to apply to uniformed members of the armed forces. *See Coffman*, 120 F.3d

*Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (quoting *Lorillard v. Pons*, 434 U.S. 575, 580–581 (1978))).[11]

Second, aware of the growing body of circuit decisions consistently holding Title VII inapplicable to uniformed servicemembers, the Congress has legislated close and systematic oversight of the military's substitute system for addressing race and sex discrimination in the armed forces. *See* 10 U.S.C. § 481. In 1994 it required the Department of Defense to conduct a biennial survey and report to include "the effectiveness of current processes for complaints on and investigations into racial and ethnic discrimination" in the

at 59 (Americans with Disabilities Act); *Baldwin v. U.S. Army*, 223 F.3d 100, 101 (2d Cir. 2000) (same); *Spain v. Ball*, 928 F.2d 61, 63 (2d Cir. 1991) (Age Discrimination in Employment Act); *Helm v. California*, 722 F.2d 507, 509 (9th Cir. 1983) (same); *Kawitt v. United States*, 842 F.2d 951, 953–54 (7th Cir. 1988) (same); *Doe v. Garrett*, 903 F.2d 1455, 1461–62 (11th Cir.1990) (Rehabilitation Act).

[11] We have recognized that this interpretive canon based on the Congress's ratification of an interpretation is of limited usefulness if the Congress has neither re-enacted a statute nor amended the specific provision at issue. *See Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003). Here, however, the Congress has amended the specific provision to make clarifications and add specific government agencies such as the Government Printing Office and the Smithsonian Institution. *See* Pub. L. No. 104–1, § 201, 109 Stat. 3 (1995); Pub. L. No. 105–220, § 341, 112 Stat. 936 (1998). We have also noted that for the canon to carry any weight, there must be "some evidence of (or reason to assume)" that the Congress is familiar "with the . . . interpretation at issue." *Pub. Citizen*, 332 F.3d at 669. As explained *infra*, we have reason to assume the Congress's awareness.

armed forces. National Defense Authorization Act for Fiscal Year 1995, Pub. L. No. 103-337, § 554(a), 108 Stat. 2773 (1994). Through four amendments, the Congress has intensified its attention to the special Equal Employment Opportunity processes and standards that apply to the armed forces. It acted first to add gender discrimination and make the surveys annual, Pub. L. No. 104-201, § 571(c), 110 Stat. 2532 (1996), second, to create four separate quadrennial surveys on race and sex discrimination in the active and reserve forces, Pub L. No. 107-314, § 561(a), 116 Stat. 2553 (2002), third, to add "harassment" and "assault" as subjects of interest in addition to "discrimination," Pub. L. No. 112-239, § 570, 126 Stat. 1752 (2013), and, last, to further define "assault" as "(including unwanted sexual contact)," Pub. L. No. 116-92, § 591, 133 Stat. 1198 (2019). The Department of Defense is required periodically to submit "Armed Forces Workplace and Equal Opportunity Surveys" to the Congress. 10 U.S.C. § 481(d)-(e). The Congress's engagement with the efficacy of the military's internal systems to combat sex and race discrimination provides added assurance of its awareness and approval of the inapplicability of Title VII itself to the armed forces.[12]

---

[12] We also find significant the Congress's efforts to clarify whether members of the Public Health Service Commissioned Corps (PHSCC) were covered by Title VII. *See Middlebrooks v. Leavitt*, 525 F.3d 341, 345 (4th Cir. 2008) (explaining that courts disagreed about whether the PHSCC was covered under Title VII and that "Congress responded to this debate by enacting the [HPEPA of 1998], which added subsection (f) to 42 U.S.C. § 213 (2000)"). To effect this clarification, the Congress chose the following language: "Active service of commissioned officers of the [PHSCC] shall be deemed to be active military service in the *Armed Forces* of the United States for *purposes of all laws related to discrimination on the basis of race, color, sex, ethnicity, age, religion, and disability*."

Nevertheless, Amicus argues that our conclusion here is controlled by our decision in *Cummings v. Department of the Navy*, 279 F.3d 1051 (D.C. Cir. 2002). We disagree. In *Cummings* we held that members of the armed forces could sue the military for damages under the Privacy Act. *Id.* at 1054. Amicus relies on the fact that we construed the term "military department" in the Privacy Act to include uniformed members of the armed forces, *see id.*, to argue that we must likewise interpret Title VII's use of that term to include uniformed members. First, the Privacy Act's language does not refer to employees of the military departments like Title VII; it defines the term "agency" to include, among other things "any . . . military department" for the purpose of the Privacy Act. *See* 5 U.S.C. § 552(f)(1). Second, in *Cummings*, we noted that the Privacy Act contained specific exemptions that "would be unnecessary if military servicepersons were excluded from the Privacy Act altogether." 279 F.3d at 1054 (quoting *Cummings v. Dep't of the Navy*, 116 F. Supp. 2d 76, 78 n.5 (D.D.C. 2000)). For example, it included one exemption for "evaluation material used to determine potential for promotion *in the armed services*." *Id.* (emphasis added) (quoting 5 U.S.C. § 552a(k)(7)). Title VII contains no such provision demonstrating an intent to protect uniformed members of the armed forces. Thus, *Cummings* is distinguishable and does not control our decision here.

---

42 U.S.C. § 213(f) (emphasis added). The Congress could have simply said that the PHSCC officers are not covered by anti-discrimination laws but, instead, it specifically chose to ground the amendment in the term "Armed Forces" to delineate that such forces are not covered by the nation's anti-discrimination laws. This legislation appears not only to recognize what circuit courts have held but also to go further, explicitly ratifying the view that uniformed members of the armed forces are not covered by anti-discrimination statutes like Title VII.

20

Before concluding, we also note that some courts that reached the same conclusion we reach today have done so based on rationales that we decline to use. First, some courts have based their Title VII conclusion on the "*Feres* doctrine," which doctrine originated in *Feres v. United States*, 340 U.S. 135 (1950). *See, e.g.*, *Hodge v. Dalton*, 107 F.3d 705, 710 (9th Cir. 1997). In *Feres*, the Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service," 340 U.S. at 146, despite language in the FTCA defining "employee of the government" to include "members of the military or naval forces of the United States." 28 U.S.C. § 2671. Although *Feres* remains good law, it has been severely criticized. *See United States v. Johnson*, 481 U.S. 681, 700–01 (1987) (Scalia, J., dissenting) ("*Feres* was wrongly decided and heartily deserves the 'widespread, almost universal criticism it has received.'" (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 580 F. Supp. 1242, 1246 (E.D.N.Y. 1984))); *Lanus v. United States*, 570 U.S. 932 (2013) (Thomas, J., dissenting from denial of certiorari) ("There is no support for [*Feres*'s] conclusion in the text of the statute, and it has the unfortunate consequence of depriving servicemen of any remedy when they are injured by the negligence of the Government or its employees."). Because we find sufficient independent bases to conclude that Title VII does not apply to uniformed members of the armed forces, we do not rely on *Feres* to reach our conclusion. For this reason, we do not extend the doctrine to Title VII. *See Lombard v. United States*, 690 F.2d 215, 233 (D.C. Cir. 1982) (Ginsburg, J., concurring in part and dissenting in part) ("While lower courts are bound by the Supreme Court's decision in *Feres*, they are hardly obliged to extend the limitation . . . .").

Second, some courts have relied on the EEOC's regulation interpreting Title VII to exclude uniformed members of the

armed forces to deny such members' claims under Title VII, basing their decision on the EEOC's authority to promulgate rules interpreting 42 U.S.C. § 2000e-16(a). *See Hodge*, 107 F.3d at 707–08; *Brown*, 227 F.3d at 298. The EEOC regulation states that its general prohibition against discrimination under Title VII, the ADEA, the Rehabilitation Act, the Equal Pay Act, and the Genetic Information Nondiscrimination Act "does not apply to: (1) Uniformed members of the military departments referred to in paragraph (b)(1) of this section." 29 C.F.R. § 1614.103(a), (d)(1). Amicus raises procedural and substantive challenges to the EEOC's regulation treating Title VII as inapplicable to "uniformed members of the military departments" but we do not credit those arguments because the Commission's reading is compelled by the statutory text. *See Hodge*, 107 F.3d at 712.

Therefore, based on the text, structure and context of 42 U.S.C. § 2000e-16(a) as well as the Congress's subsequent actions in light of the unanimous circuit precedent on the issue, we hold that Title VII does not apply to uniformed members of the armed forces. As such, we affirm the district court's dismissal of Jackson's Title VII claim.

## B.   APA Claim

Amicus also appeals the district court's dismissal of Jackson's APA claim. The district court inferred an APA claim challenging the decisions of the Board for Correction of Naval Records regarding Jackson's fitness records and his reenlistment code. *Jackson*, 313 F. Supp. 3d at 309. We first note that, despite the Secretary's arguments to the contrary, the APA claim is properly before us. The district court liberally construed Jackson's pro se complaint to include claims beyond Title VII. Indeed, the Secretary himself suggested in his motion to dismiss that Jackson could be raising an APA claim.

Def.'s Mem. Supp. Mot. Dismiss 18. Moreover, although we appointed Amicus principally to address the Title VII claim, we did not otherwise limit the arguments or claims he could raise on appeal on Jackson's behalf. Order No. 1762275 at 1 (No. 18-5180) (D.C. Cir. Nov. 30, 2018).

**1.**

The parties do not dispute that Jackson's APA claim is time-barred by the six-year statute of limitations in 28 U.S.C. § 2401(a) for all civil actions commenced against the United States. Instead, they dispute whether § 2401(a)'s statute of limitations is a jurisdictional bar—thereby divesting the court of jurisdiction as well as its ability to consider an equitable tolling argument—or whether it is non-jurisdictional.

The long-held rule in our circuit has been "that section 2401(a) creates 'a jurisdictional condition attached to the government's waiver of sovereign immunity.'" *P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1026 (D.C. Cir. 2008) (quoting *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987)). Recently, however, especially after the Supreme Court's decision in *Kwai Fun Wong*, which held the two-year statute of limitations in § 2401(b) to be nonjurisdictional, 575 U.S. at 407, the soundness of our precedent has been called into doubt. *See, e.g.*, *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 37 n.7 (D.D.C. 2018) ("Given the Supreme Court's clear strictures on this issue, which have undermined the foundations of *Spannaus* and similar cases, the D.C. Circuit ought to reconsider its § 2401(a) precedents."). Since *Kwai Fun Wong*, the Sixth and Tenth Circuits have held that, based on the Supreme Court's opinion in that case, § 2401(a) is not jurisdictional.[13] *Chance v. Zinke*, 898

---

[13] Even before *Kwai Fun Wong*, the Ninth Circuit held that § 2401(a) is not jurisdictional. *Cedars–Sinai Med. Ctr. v.*

F.3d 1025, 1033 (10th Cir. 2018); *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 817–18 (6th Cir. 2015). Although we have previously "questioned the continuing viability" of our rule without addressing the issue directly, *see Mendoza v. Perez*, 754 F.3d 1002, 1018 n.11 (D.C. Cir. 2014) (citing *P & V Enters.*, 516 F.3d at 1027 & n.2; *Felter v. Kempthorne*, 473 F.3d 1255, 1260 (D.C. Cir. 2007); *Harris v. F.A.A.*, 353 F.3d 1006, 1013 n.7 (D.C. Cir. 2004)), we now do so. Accordingly, we hold today that the Supreme Court's decision in *Kwai Fun Wong* overrules our precedent treating § 2401(a)'s statute of limitations as jurisdictional.[14]

---

*Shalala*, 125 F.3d 765, 770–71 (9th Cir. 1997). The Fifth Circuit did the same, *see Clymore v. United States*, 217 F.3d 370, 374 (5th Cir. 2000) ("[T]he doctrine of equitable tolling has potential application in suits . . . governed by the statute of limitations codified at 28 U.S.C. § 2401(a)."), but subsequent Fifth Circuit precedent is less clear, *compare Doe v. United States*, 853 F.3d 792, 802 (5th Cir. 2017), *as revised* (Apr. 12, 2017) ("Although courts may equitably toll § 2401(a), they do so 'sparingly.'" (citation omitted) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002))), *and Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 584 (5th Cir. 2016) ("Timeliness [under § 2401(a)] does not raise a jurisdictional issue in this court."), *with Gen. Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 318 (5th Cir. 2020) ("[Section 2401(a)'s] timing requirement is jurisdictional, because it is a condition of the United States' waiver of sovereign immunity.").

[14] "[W]e cannot overrule a prior panel's decision, except via an *Irons* footnote or en banc review . . . ." *United States v. Emor,* 785 F.3d 671, 682 (D.C. Cir. 2015). "In an *Irons* footnote, named after the holding in *Irons v. Diamond,* 670 F.2d 265, 267–68 & n. 11 (D.C. Cir. 1981), the panel 'seek[s] for its proposed decision the endorsement of the *en banc* court, and announce[s] that endorsement in a footnote to the panel's opinion.'" *Oakey v. U.S. Airways Pilots Disability Income Plan*, 723 F.3d 227, 232 n.1 (D.C. Cir. 2013) (alteration in original) (quoting Policy Statement on En Banc

"In recent years," the Supreme Court has "repeatedly held that procedural rules, including time bars, cabin a court's power" to hear a case—i.e., subject matter jurisdiction—"only if Congress has 'clearly state[d]' as much." *Kwai Fun Wong*, 575 U.S. at 409 (alteration in original) (quoting *Sebelius v. Auburn Reg'l Med. Cent.*, 568 U.S. 145, 153 (2013)). Applying this "clear statement rule," the Court has "made plain that most time bars are nonjurisdictional." *Id.* at 410. In *Kwai Fun Wong*, the Supreme Court explained that "Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it." 575 U.S. at 410. Based on that rule, the Court held that the FTCA's statute of limitations in § 2401(b) was "not a jurisdictional requirement." *Id.* at 412.

Applying the Court's ruling in *Kwai Fun Wong* to § 2401(a), we reach the same conclusion. First, our precedent treating § 2401(a) as a jurisdictional bar was grounded in the belief that the provision is "attached to the government's waiver of sovereign immunity, and as such must be strictly construed." *Spannaus*, 824 F.2d at 55. In *Kwai Fun Wong*, the Court flatly rejected this reasoning. 575 U.S. at 420 ("[I]t makes no difference that a time bar conditions a waiver of sovereign immunity, even if the Congress enacted the measure when different interpretive conventions applied . . . ."). Second, like § 2401(b), § 2401(a) "does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts"; rather, it "'reads like an ordinary, run-of-the-mill statute of limitations,' spelling out a litigant's filing obligations without restricting a court's authority." *Id.* at 411 (first quoting *Arbaugh*, 546 U.S. at 515;

Endorsement of Panel Decisions at 1 (Jan. 17, 1996)). Our resolution here—recognizing the overruling of our precedent by the Supreme Court's decision in *Kwai Fun Wong*—has been approved by the *en banc* court and thus constitutes the law of the circuit.

then quoting *Holland v. Florida*, 560 U.S. 631, 647 (2010)); *see* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). Also like § 2401(b), § 2401(a)'s filing deadline appears in a section separate from the general jurisdictional grant of civil actions against the federal government, *see* 28 U.S.C. § 1346; *Herr*, 803 F.3d at 817, which the Supreme Court found to be an indication "that the time bar is not jurisdictional." *Kwai Fun Wong*, 575 at 411.

Third, we conclude that § 2401(a)'s origins in the Tucker Act do not make it otherwise jurisdictional. We find the in-depth analyses and reasoning of the Sixth and Tenth Circuits on this point—differentiating between the separate provisions of the Big Tucker Act and the Little Tucker Act—particularly cogent and persuasive. *See Herr*, 803 F.3d at 815–17; *Chance*, 898 F.3d at 1031–33. As those courts explained, although the Supreme Court has affirmed the jurisdictional nature of the Big Tucker Act's statute of limitations, *see* 28 U.S.C. § 2501, its affirmance was grounded solely in the doctrine of stare decisis; further, the Congress altered the Little Tucker Act's statute of limitations—the provision from which § 2401(a) is derived—by separating it from the jurisdictional grant and expanding its reach. *See Chance*, 898 F.3d at 1032–33; *Herr*, 803 F.3d at 816–17. As the Sixth Circuit explains, this alteration "demonstrates that § 2401(a) was designed to serve as a standard, mine-run statute of limitations without jurisdictional qualities. That leaves us with a statute (§ 2401(a)) that does not clearly impose a jurisdictional limit." *Herr*, 803 F.3d at 817.

Accordingly, we hold that § 2401(a)'s time bar is nonjurisdictional and subject to equitable tolling. Our

decisions to the contrary, *see, e.g.*, *Spannaus*, 824 F.2d at 55, are thus overruled.[15]

**2.**

Having determined that § 2401(a)'s statute of limitations is not jurisdictional, we turn to Jackson's equitable tolling argument in support of his APA claim. The district court considered the merits of Jackson's equitable tolling argument and we review its dismissal of Jackson's APA claim de novo.[16] *See Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 278 (D.C. Cir. 2003). To demonstrate that he is entitled to the benefit of equitable tolling, Jackson must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005). We have described the remedy of "equitable tolling as appropriate only in 'rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'" *Head v. Wilson*, 792 F.3d 102, 111 (D.C. Cir. 2015) (quoting *Whiteside v. United States*, 775 F.3d 180, 184 (4th Cir. 2014)).

On appeal, Amicus argues that equitable tolling is warranted because Jackson's "debilitating mental anguish as a result of the government's misconduct prevented his timely filing of the APA claim." Amicus Br. at 49. Amicus relies on our holding in *Smith-Haynie v. D.C.*, 155 F.3d 575 (D.C. Cir. 1998), to argue that Jackson was "*non compos mentis*," which ordinarily means "incapable of handling [one's] own affairs or

---

[15] *See supra* note 14.

[16] Because we hold that § 2401(a)'s statute of limitations is not jurisdictional, the dismissal of Jackson's APA claim should be reviewed pursuant to Rule 12(b)(6) for failure to state a claim rather than Rule 12(b)(1) for lack of subject matter jurisdiction.

unable to function [in] society." *Id.* at 580 (second alteration in original).

Amicus's equitable tolling argument does not meet the high threshold for applying this rare remedy. *See id.* at 579–80 ("The court's equitable power to toll the statute of limitations will be exercised only in extraordinary and carefully circumscribed instances." (quoting *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988))). Although Jackson's allegations, if true, indicate that he suffered mental and emotional harm as a result of being discriminated against, they do not rise to the level of *non compos mentis*. As we explained in *Smith-Haynie*, "[i]mpaired judgment alone is not enough to toll the statute of limitations." 155 F.3d at 580 (quoting *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 665 (D.C. 1997)). "The disability of a person claiming to be *non compos mentis* must be 'of such a nature as to show [he] is unable to manage [his] business affairs or estate, or to comprehend [his] legal rights or liabilities.'" *Id.* (quoting *Decker v. Fink*, 47 Md. App. 202, 422 A.2d 389, 392 (Md. 1980)). *Smith-Haynie* references various facts indicative of *non compos mentis*, including being "[un]able to engage in rational thought and deliberate decision making sufficient to pursue" a legal claim whether "alone or through counsel" or diagnosed with schizophrenia, "adjudged incompetent," or appointed a caretaker or power of attorney. *Id.* (first quoting *Nunnally v. MacCausland*, 996 F.2d 1, 5–6 (1st Cir. 1993); and then quoting *Speiser v. U.S. Dep't of Health & Human Servs.*, 670 F. Supp. 380, 385 (D.D.C. 1986), *aff'd*, 818 F.2d 95 (D.C. Cir. 1987)). Jackson's allegations of "pain, anger, depression, hopelessness and bewilderment," the "divorce from [his] wife caused by [his] difficult emotion [and] mental state," "[l]oss of enjoyment of life," "insomnia, distrust, depression, anxiety" and "financial hardship" as a result of the discrimination he suffered, Compl. 12, 17, although serious, do not rise to the level of *non compos mentis* such that he was

unable to manage his own affairs or comprehend his rights or liabilities.

Indeed, the allegations in his complaint demonstrate that Jackson was able to manage his affairs and comprehend his rights quite well. Jackson alleges that at the time of the alleged discrimination, he knew that he "had been subjected to wrongdoing and strongly desired justice." *Id.* at 12. He alleges that "[f]or an extended period of time, I sought help from the Department of the Navy, Department of Justice, Attorneys, congressmen, news media, etc." *Id.* at 12–13. He describes these efforts as a "massive undertaking." *Id.* at 13. Indeed, after being discharged from the military, he filed applications with the Board for Correction of Naval Records regarding his fitness record and reenlistment code in 1990, 1991, 1992, 1993, 1994 and 2000. During this time, he sought legal assistance as well as assistance from others, including a United States Senator, to reenlist in the Marines. This conduct indicates that he was capable of filing a timely APA claim. He is not entitled to equitable tolling, then, and the district court correctly dismissed his claim.

## C.  Military Pay Act

Finally, we briefly address Jackson's Military Pay Act claim. The district court construed Jackson's request for reenlistment with back pay as a claim under the Military Pay Act, 37 U.S.C. § 204, but held that it lacked jurisdiction of that claim. Amicus initially appealed the dismissal of the claim but in its reply brief abandoned the claim on the ground raised by the Secretary—namely, we lack jurisdiction to hear the appeal of a Military Pay Act claim because the Court of Appeals for the Federal Circuit has exclusive jurisdiction of such claims. Having considered that argument, we agree that we lack

jurisdiction to review the claim pursuant to 28 U.S.C. § 1295(a)(2).

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*